Curtis **VAGNEUR** and Jeffrey Evans, Petitioners–Appellants,

v.

**CITY OF ASPEN**, State of Colorado; Kathryn Koch, in her official capacity as City Clerk for the City of Aspen; Karen Goldman, in her official capacity as Administrative Hearing Officer; Les Holst; Clifford Weiss; and Terry Paulson, Respondents–Appellees.

No. 08CA2552.

Colorado Court of Appeals, Div. III.

Oct. 29, 2009.

---

* Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and § 24–51–1105, C.R.S.2009.

Isaacson Rosenbaum P.C., Edward T. Ramey, Denver, Colorado; Wright & LaSalle, LLP, Gary A. Wright, Aspen, Colorado, for Petitioners–Appellants.

John P. Worcester, City Attorney, James. R. True, Special Counsel, Aspen, Colorado, for Respondents–Appellees City of Aspen, Kathryn Koch, and Karen Goldman.

Klein, Coté & Edwards, LLC, Herbert S. Klein, Corey T. Zurbuch, Aspen, Colorado, for Respondents–Appellees Les Holst, Clifford Weiss, and Terry Paulson.

Opinion by Judge MILLER.

Petitioners, Curtis Vagneur and Jeffrey Evans, appeal the district court's order concluding that two initiated ordinances they submitted consisted of administrative matters and therefore could not be placed on the ballot for the City of Aspen voters. We affirm.

## I. Facts and Proceedings

### A. Background

The facts are largely undisputed. Since the 1980s, the City of Aspen has been addressing how to facilitate and expand entry into the city from the west via state Highway 82 (the Entrance to Aspen). After preparing a series of environmental impact statements, the city identified a proposal as the preferred alternative for the Entrance to Aspen. The participants in this process included engineers; staff from the Federal Highway Administration (FHA), the Colorado Department of Transportation (CDOT), Pitkin County, and the city; and representatives of wetlands, air quality, water, wildlife, floodplains, archaeological resources, noise, fisheries, open space, and historic preservation interests. The city's team considered numerous alternatives, including two-lane, three-lane, and four-lane roads; building at grade, below grade, or above grade; and access for general traffic, high-occupancy vehicles (HOV), buses, light rail, and guided buses.

In 1996, the City Council placed a question relating to the Entrance to Aspen on the ballot, and the voters authorized the use and conveyance to CDOT of necessary rights-of-way across certain open space and transportation properties owned by the city, for the purpose of constructing a two-lane parkway and a corridor for light rail transit. In 1998, following development of an environmental impact statement by the city and CDOT, a Record of Decision issued explaining the preferred alternative. The alternative provided for two general purpose lanes, a corridor for light rail, or, if light rail was not feasible, two dedicated bus lanes, and called for the creation of a "cut and cover" tunnel through the open space. The "cut and cover" tunnel would be built by digging a trench, inserting the tunnel structure, and then covering it and revegetating the top to mitigate the taking of open space as required by federal law.

Thereafter, the city, CDOT, and the FHA signed a Memorandum of Understanding (MOU) agreeing to perform acts furthering the construction of the preferred alternative as described in the 1998 Record of Decision. The MOU served as a contract among the parties, subject to amendment only upon written agreement of all three parties. The city in 2002 then conveyed an easement over 8.6 acres of open space to CDOT for the construction of a two-lane highway and light rail platform. The conveyance was inconsistent with the preferred alternative in that it did not authorize the construction of two dedicated bus lanes as an alternative to a light rail platform.

In May 2007, the city placed on the ballot the question of changing the use of part, but not all, of the open space conveyed to CDOT to permit the construction of bus lanes, consistent with the plan set forth in the preferred alternative. The voters approved. As of the trial court's order, CDOT had constructed a four-lane highway, including two general purpose lanes and two bus lanes, through the portion of the open space covered by the 2007 ballot measure.

## B. The Petitions

In August 2007, petitioners submitted two initiative petitions complying with the procedures set forth in sections 31–11–101 through 31–11–118, C.R.S.2009. The petitions set forth alternative proposals for construction of the Entrance to Aspen. Prior to circulating the petitions, petitioners submitted the proposed petitions to the City Clerk, who approved the petitions as to form only, under section 31–11–106, C.R.S.2009. In her letter to petitioners, the City Clerk indicated that the petitions implicated administrative rather than legislative matters and also contained issues, which, if not resolved, would create practical difficulties in implementation.

The first petition, referred to as Alternative F, contained the following question:

Shall the State of Colorado, Department of Transportation (CDOT) be authorized to construct, operate and maintain a four lane highway configuration consisting of two general highway lanes and two vehicle and/or transit lanes (HOV) with a cut and cover tunnel, and a transit envelope next to the highway lanes, on property conveyed to CDOT by the City of Aspen, including the Marolt property?

The proposed ordinance sought to authorize the conveyance of land adjacent to the five-mile stretch of Highway 82 just west of Aspen to CDOT for the construction of a four-lane highway consisting of two general lanes and two HOV lanes. The proposal would rescind all prior inconsistent enactments or authorizations and acknowledged that its implementation would require abandonment of the preferred alternative for the Entrance to Aspen described in the 1998 Record of Decision. The proposed ordinance also contained a number of design directives, summarized by the trial court in its order as follows:

(a) CDOT is to use its discretion in the design of the Maroon/Castle/Highway 82 intersection;

(b) lane management is to be consistent with the limitations from Basalt to Buttermilk;

(c) the cut and cover tunnel is to be no less than 400 feet, which will allow the recovery of 2 acres or more of Marolt open space;

(d) the road is to have a curved alignment to avoid encroaching on the community garden and hang-gliding and para-sailing landing zone;

(e) CDOT is not to return the old portion of Highway 82 between Cemetery Lane and Maroon Creek to open space;

(f) the road alignment is to be designed to be as sensitive as possible to the location of the historic Holden Smelting and Milling Complex and Museum;

(g) the City is to "warrant" that it will adjust boundaries for any qualitative purposes; and

(h) CDOT is to follow a landscape plan to include plantings, berms and depressions and other methods to mitigate environmental and neighborhood concerns.

The proposed ordinance further provided that the road was to be built after completion of a reevaluation pursuant to 23 C.F.R.

§ 771.129 and issuance of a revised Record of Decision pursuant to 23 C.F.R. § 771.127 if required.

The second initiative petition proposed an ordinance called Alternative D, which was nearly identical to Alternative F, but eliminated the cut and cover tunnel described in Alternative F, and instead proposed an at-grade road between Main Street and the roundabout. The question proposed in the second petition was:

Shall the State of Colorado, Department of Transportation (CDOT) be authorized to construct, operate and maintain a four lane highway configuration consisting of two general highway lanes and two vehicle and/or transit lanes (HOV) with a transit envelope next to the highway lanes on property conveyed to CDOT by the City of Aspen, including the Marolt property?

## C. The Protests

Les Holst, Clifford Weiss, and Terry Paulson (the protestors) filed two protest letters pertaining to each petition pursuant to section 31–11–110(1), C.R.S.2009. The letters alleged that the petitions were invalid because (1) they sought to govern administrative matters which were not subject to the people's initiative power; (2) the proposed ordinances violated the requirement that voter initiatives address a single subject only; and (3) the ballot titles were misleading.

## D. Administrative Proceedings

The Aspen City Council appointed a hearing officer to address the protests. An administrative hearing was held on October 22, 2007. The hearing officer heard a statement from petitioner Evans, as well as testimony from the protestors' witnesses, including the protestors' attorney, the Assistant City Manager for Aspen, the former Public Works Director, and the Pitkin County Engineer. The testimony covered, among other issues, the history of the Entrance to Aspen, how petitioners' proposed ordinances would impact the prior decisions taken by the city, CDOT, and the FHA on the issue, and safety concerns regarding the construction of the highway.

In a written decision, the hearing officer concluded that both petitions concerned "administrative processes that are needed to effect implementation of a proposed entrance to Aspen approved by the electors in 1996," and therefore upheld the protests. The hearing officer declined to sever the impermissible portions of the initiatives because petitioners testified that they believed the conditions listed in the petitions were necessary to understand the proposals in their entirety.

## E. District Court Proceedings

Petitioners then filed a petition for review of the hearing officer's decision pursuant to section 31–11–110(3), C.R.S.2009, in the Pitkin County District Court. As pertinent here, petitioners argued that, contrary to the hearing officer's decision, the proposed initiatives contained exclusively legislative material. In the alternative, petitioners requested that the district court sever any portions of the proposed initiatives deemed to be administrative matters and declare the revised petitions sufficient.

After receiving briefing from petitioners and the city, the City Clerk, the hearing officer, and the protestors, the district court issued a twenty-four-page order affirming the hearing officer's decision. In its order, the district court concluded that the proper standard of review was similar to that of a C.R.C.P. 106 proceeding, as the court was reviewing the decision of a quasi-judicial proceeding. The district court further affirmed the hearing officer's decision that the petitions contained administrative matters that may not be included in an initiative petition, the administrative portions of the proposals therein could not be severed, and the initiative petitions were therefore insufficient.

This appeal followed.

## II. Standard of Review

Section 31–11–110 is silent as to what standards of review should be applied by this court and by the district court.

Petitioners contend that we should apply the standard of review for a mixed question of law and fact, and review the district

court's factual findings for abuse of discretion, but review its application of law to those facts de novo. The protestors assert that we should apply a more deferential standard of review, and, standing in the same position as the district court, consider whether there is a reasonable basis for the hearing officer's ruling, whether the hearing officer applied the correct legal standard, and whether there is competent evidence in the record to support her ruling.

The underlying facts of the case are largely undisputed. Because we affirm under a de novo review the district court's order upholding the hearing officer's decision, we need not consider whether the more deferential standard proposed by the protestors applies. *See People v. Arroya*, 988 P.2d 1124, 1129 (Colo.1999) (where an appellate court is presented with a mixed question of law and fact, we defer to the factual findings of the court so long as there is sufficient evidence in the record to support them, but we review the trial court's legal conclusions de novo).

### III. Subject Matter for Initiatives

Petitioners contend the district court erred when it affirmed the hearing officer's conclusion that their proposed initiatives related to administrative matters and could not be placed on the ballot under the people's initiative power. We disagree.

### A. Law

In the Colorado Constitution, the people reserve for themselves the power to legislate by way of initiative and referendum "as to all local, special, and municipal *legislation.*" Colo. Const. art. V, § 1(9) (emphasis added). Additionally, the City of Aspen Charter provides that "[t]he registered electors of the City may initiate a proposed ordinance, pursuant to the initiative power reserved by Article V, Section 1(9) of the State Constitution, as to any *legislative* matter which is subject to said *legislative* power." Aspen City Code art. V, § 5.1(a) (emphasis added).

 Thus, both the Colorado Constitution and the City Charter limit the people's initiative power to legislative matters. *See also City of Idaho Springs v. Blackwell*, 731

P.2d 1250, 1253 (Colo.1987); *City of Colorado Springs v. Bull*, 143 P.3d 1127, 1131 (Colo. App.2006). State and local government officials may not prohibit the people from exercising their initiative powers by prematurely concluding that the initiated ordinance lacks substantive merit or is unconstitutional before the initiative process has run its course and the ordinance has been adopted. *McKee v. City of Louisville*, 200 Colo. 525, 530, 616 P.2d 969, 972–73 (1980). However, before a proposal is placed on the ballot, a judicial declaration may be made determining whether the initiated ordinance is legislative in character, or whether it merely addresses administrative matters and is not a proper exercise of the people's constitutional right to legislate by initiative. *Blackwell*, 731 P.2d at 1253. There are no reported Colorado appellate opinions addressing this issue in the context of the design and construction of streets or highways.

 The classification of a proposed ordinance as legislative or administrative is largely an ad hoc determination. *Id.* at 1254. Three tests are used to determine whether petitions for initiated ordinances relate to legislative or administrative matters. *Id.* First, "actions that relate to subjects of a permanent or general character are legislative, while those that are temporary in operation and effect are not." *Witcher v. Canon City*, 716 P.2d 445, 449 (Colo.1986). Second, "acts that are necessary to carry out existing legislative policies and purposes or which are properly characterized as executive are deemed to be administrative, while acts constituting a declaration of public policy are deemed to be legislative." *City of Aurora v. Zwerdlinger*, 194 Colo. 192, 196, 571 P.2d 1074, 1077 (1977). Finally, in appropriate cases, we apply the "legislative amendment" test, in which we consider whether an initiated ordinance is an amendment to an original legislative act, and likewise legislative in character. *Blackwell*, 731 P.2d at 1254 n. 4 (citing *Margolis v. District Court*, 638 P.2d 297, 303–04 (Colo.1981), and *Witcher*, 716 P.2d at 450).

 We may also consult the city charter in determining whether a proposed act is

legislative or administrative. *Bull,* 143 P.3d at 1134.

We apply these three tests in turn, and then address the city charter.

### B. Analysis

■ The desired effect of the proposals is to revise the terms of the right-of-way previously conveyed to CDOT in 1996 by substituting (subject to CDOT's agreement) a new right-of-way with a new design for the highway configuration. We conclude that, while the construction of a highway may have long-lasting implications, the design, construction, operation, and maintenance of a specific highway structure designed to accommodate specific traffic uses is not a "permanent" or general act.

The supreme court has declared that the use of the term "permanent" signifies "a declaration of public policy of general applicability because a permanent enactment is more likely to involve policy considerations." *Blackwell,* 731 P.2d at 1254. In considering whether an act is permanent or temporary for the purpose of an initiated ordinance, the supreme court has held, for example, that the selection of the site and structure for a city hall and the amendment of a lease of the Royal Gorge between a city and a contractor are temporary acts that must be deemed administrative. *See id.; Witcher,* 716 P.2d at 450.

We find the supreme court's reasoning in *Blackwell* to be applicable to the present case. In *Blackwell,* the Idaho Springs city council enacted an ordinance establishing a tax to fund a number of projects, including a new city hall. *Blackwell,* 731 P.2d at 1251. The city council approved a motion authorizing the purchase of a specific piece of property for the new city hall, and the move and renovation of a landmark building to the property for use as the city hall. *Id.* The city entered into contracts to effectuate the council's decisions, and the building was moved to the property. *Id.* Citizens opposed to the purchase of the property and use of the landmark as the city hall filed two petitions for initiated ordinances seeking to repeal any council actions authorizing the move of the landmark or the acquisition of the

property to which the landmark had already been moved, and also seeking to prohibit the use of funds for the purpose of relocating the landmark or acquiring the property. *Id.* at 1251–52.

Considering the permanence test, the supreme court reasoned that although the structure for a city hall was permanent in that it would serve as the city hall for an indefinite period of time, the duration of the legislation or the anticipated life of the city hall did not determine permanence. *Id.* at 1254. Because the proposed ordinances only excluded a specific piece of real estate and a specific building from a variety of choices available to the city to implement the previously declared policy of securing and building a city hall, they did not relate to a general policy declaration of general applicability, and therefore were not permanent in nature. *Id.* at 1254–55.

■ Here, the initiatives each would authorize (but not require) CDOT—not the city—to construct the Entrance to Aspen using a design different from that developed for the same land over many years by the city's engineers and administrative staff in conjunction with their counterparts from CDOT and FHA. The proposals would also rescind all inconsistent enactments and authorizations. If implemented, the proposals would require the city to amend existing contractual obligations, including the MOU, and to rescind or amend the existing right-of-way. The formation of contracts by a city and amendments of contracts to which a city is a party to further its policies are administrative matters, not suitable for an initiative. *See Witcher,* 716 P.2d at 450 (when amending a lease, neither party presumes an amendment to be permanent in nature or effect, and the amendments of such a lease when the city is a party are administrative and not proper subjects for an initiative); *cf. Bull,* 143 P.3d at 1137 (formation of specific contracts of temporary character is administrative matter, even though the creation of new permanent and general policies limiting the city's ability to enter into a class of contracts is a permanent and legislative matter appropriate for an initiative).

Thus, the proposed ordinances are administrative and not legislative in nature. They would reverse a host of administrative actions and decisions made not just by the city's administrative staff, but also by at least two administrative agencies—CDOT and the FHA. *See Seattle Building & Constr. Trades Council v. City of Seattle,* 94 Wash.2d 740, 620 P.2d 82, 88 (1980) (proposed initiative to block construction of additional highway lanes at a specific location would reverse administrative decisions of city officials and was thus invalid). The new design could be implemented only if those administrative agencies agreed to it. Under these circumstances, we cannot conclude that the hearing officer and district court erred in determining that the proposals were administrative and not suitable for legislative initiatives.

■ Petitioners allege that their proposals are more akin to rezoning decisions, which are legislative, *Margolis,* 638 P.2d at 304, because they call for the long-term change of use for a piece of property to accommodate new transportation infrastructure. We are not persuaded. An original zoning decision typically involves the adoption of a comprehensive zoning or land use code regulating the use of all private and public property within a municipality. Such establishing of land use policy is legislative in character because it is general and permanent and involves a general rule or policy. *Id.* Any rezoning necessarily changes the land use policy with respect to the property implicated. *Id.* For the reasons discussed above, however, the factors relating to the permanence of the ordinances proposed here indicate that the petitions address administrative matters.

■ Turning to the second test articulated in *Zwerdlinger,* petitioners contend that their proposals are not necessary or intended to carry out existing legislative polices or purposes and instead declare public policy. We agree with the district court's conclusion that prior city actions on this matter, such as the 1998 Record of Decision and the MOU, stemmed from administrative processes and were accordingly clearly administrative. Because petitioners' initiated ordinances sought to change the administrative

details of those decisions, they should similarly be deemed administrative.

■ Petitioners also contend we should apply the legislative amendment test here because the proposals seek to amend the 1996 ballot measure, which was legislative. We disagree. The petitions do not purport to amend the 1996 ballot measure, nor do they even reference the 1996 ballot measure. That fact notwithstanding, the petitions seek a change in the design and use of the right-of-way, rather than a change in any policy of a general or permanent nature. The change in use is indeed administrative in character—reconfiguring lanes. Accordingly, we do not agree with petitioners' assertion that the legislative amendment test applies to their proposals, and even if we were to apply the test, the initiatives would fail.

■ We may also consult the Aspen City Charter in determining whether a proposed act is legislative or administrative. *Bull,* 143 P.3d at 1134. The district court concluded that section 13.4 of the City Charter limiting the city council's ability to convey open space property without the approval of the voters rendered the voters' approval of a conveyance and change of use of open space a legislative matter. We disagree with the district court.

Petitioners have conceded in this court that neither the action of the City Council in placing the 1996 measure on the ballot nor section 13.4 renders the current proposals legislative. The mere fact that the City Charter requires voter approval of any proposed conveyance of an interest in open space does not dictate the conclusion that voters may by initiative compel the city to convey a specific right-of-way or that such a measure would be legislative. Other sections of the City Charter, such as sections 6.1 and 6.3 addressing the powers and duties of the city manager, charge the city manager with the proper administration of all affairs of the city, including the provision of engineering, architectural, maintenance, and construction services required by the city. These sections of the charter indicate that tasks related to municipal engineering and construction, such as the design and construction of a highway,

are intended by the city to be viewed as administrative.

## IV. Conclusion

The order is affirmed.

Judge ROY and Judge FURMAN concur.